FILED
United States Court of Appeals
Tenth Circuit

December 3, 2018

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

GEORGE W. STRAUB, IV,

      Plaintiff - Appellant,

v.

BNSF RAILWAY COMPANY,

      Defendant - Appellee.

No. 17-1050

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CV-01890-CMA-MEH)**

James L. Cox, Jr., Brent Coon & Associates, Denver, Colorado, for the Appellant.

Cash K. Parker (Malcolm S. Mead and Keith M. Goman on the brief), Hall & Evans, L.L.C., Denver, Colorado, for the Appellee.

Before **BACHARACH**, **MURPHY**, and **McHUGH**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

George Straub, an employee of BNSF Railway Company ("BNSF"), injured his back and neck when, in the course and scope of his duties, he attempted to adjust the engineer's chair of Locomotive #6295. Straub brought suit, asserting

BNSF was, inter alia, strictly liable for his injuries under the provisions of the Federal Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701–20703, and its implementing regulations, 49 C.F.R. pt. 229. Upon BNSF's Fed. R. Civ. P. 12(b)(6) motion to dismiss, the district court concluded Straub's injuries did not implicate LIA. The district court ruled the adjustment mechanism of the engineer's seat was not an "integral or essential part of a completed locomotive." *Cf. S. Ry. Co. v. Lunsford*, 297 U.S. 398, 402 (1936) (describing the parts of a locomotive that are covered by LIA). Instead, according to the district court, the seat adjustment mechanism was a non-essential comfort device. In reaching this conclusion, the district court relied on this court's decision in *King v. Southern Pacific Transportation Co.*, 855 F.2d 1485, 1488–89 (10th Cir. 1988). Straub appeals, asserting the district court's reliance on *King* is misplaced. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **reverses** and **remands** the matter to the district court for further proceedings consistent with this opinion.

## II. BACKGROUND

### A. General Legal Background

Congress enacted the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60, after it determined the railroad industry owed a duty to its employees who daily expose themselves to extreme hazards.[1] FELA provides that

---

[1]*See Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542–43 (1994)

(continued...)

"[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." *Id.* § 51. "[T]he general congressional intent was to provide liberal recovery for injured workers." *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432 (1958). Thus, FELA does "away with several common-law tort defenses that had effectively barred recovery by injured workers." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542–43 (1994) (noting FELA rejects the doctrine of contributory negligence, prohibits employers from exempting themselves from coverage via contract, and abolishes the defense of assumption of risk). Given that Congress intended FELA to be a broad, remedial statute, the Supreme Court has adopted a standard of liberal construction to facilitate Congress's objective of compensating railroad workers who are injured on the job. *See, e.g., id.* at 543; *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691–92, 695 (2011).

---

[1](...continued)
("[W]hen Congress enacted FELA in 1908, its attention was focused primarily upon injuries and death resulting from accidents on interstate railroads. Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the human overhead of doing business from employees to their employers." (quotations and citations omitted)).

LIA is an amendment to FELA and the two statutes are to be construed together. *See Urie v. Thompson*, 337 U.S. 163, 189 (1949).[2] LIA makes it unlawful for a carrier to use any locomotive on its railway lines unless the locomotive and its "parts and appurtenances are safe to operate." 49 U.S.C. § 20701(1).[3] As is true of FELA, LIA must be construed liberally to carry out its remedial and humanitarian purposes. *Urie*, 337 U.S. at 189, 191; *see also Garcia v. Burlington N. R.R. Co.*, 818 F.2d 713, 715 (10th Cir. 1987) (holding that because LIA is "a remedial statute, it should be construed liberally to protect railroad workers against harm caused by defective railroad equipment"). The remedial purposes of FELA and LIA are promoted through the imposition of different types of liability. Unlike FELA, where proof of negligence is required,

---

[2]*Urie*, as well as many other cases cited in this opinion, were decided under the provisions of the predecessor to LIA, the Federal Boiler Inspection Act ("BIA"), 45 U.S.C. § 22–34. *Urie v. Thompson*, 337 U.S. 163, 188 (1949). The provisions of BIA have been carried forward in LIA without meaningful substantive change. *See Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 629 (2012). That being the case, this court will cite cases interpreting BIA and LIA interchangeably. Furthermore, in resolving this appeal, we are bound by Supreme Court decisions and Tenth Circuit precedent interpreting BIA. *See United States v. Edward J.*, 224 F.3d 1216, 1220 (10th Cir. 2000) ("Under the doctrine of stare decisis, this panel cannot overturn the decision of another panel of this court barring en banc reconsideration, a superseding contrary Supreme Court decision, or authorization of all currently active judges on the court." (quotation omitted)).

[3]LIA provides as follows: "A railroad carrier may use or allow to be used a locomotive . . . on its railroad line only when the locomotive . . . and its parts and appurtenances . . . are in proper condition and safe to operate without unnecessary danger of personal injury . . . ." 49 U.S.C. § 20701(1).

LIA imposes on railroad carriers an absolute duty to maintain the locomotive in proper condition and safe to operate. 49 U.S.C. § 20701; *Lilly v. Grand Trunk W. R.R.* Co., 317 U.S. 481, 485 (1943); *Matson v. Burlington N. Santa Fe R.R.*, 240 F.3d 1233, 1235 (10th Cir. 2001). Even if a railroad carrier complies with every regulation promulgated by the Federal Railroad Administration ("FRA"),[4] it will still violate LIA if a locomotive is not in proper condition and safe to operate without unnecessary danger of injury. *Lilly*, 317 U.S. at 485–86.

LIA does not create a private right of action. *Urie*, 337 U.S. at 188. A railroad employee injured due to a LIA violation brings an action through FELA; a LIA violation substitutes for "negligence" in 45 U.S.C. § 51 and creates strict liability. *Id.* at 188–89 (characterizing LIA as a supplement to FELA, which "dispense[s], for the purposes of employees' suits, with the necessity of proving that violations of the safety statutes constitute negligence; and mak[es] proof of such violations . . . effective to show negligence as a matter of law"). A railroad carrier can violate LIA either by (1) breaching the broad statutory duty to keep all parts and appurtenances of its locomotives in proper condition and safe to operate without unnecessary danger of personal injury (the general statutory duty) or (2)

---

[4]The FRA is an "Operating Administration" within the Department of Transportation. 49 C.F.R. § 1.2. It is responsible for promulgating regulations to enforce the provisions of LIA. *Id.* § 1.89(a) (delegating to the FRA authority to "[c]arry out the functions and exercise the authority vested in the Secretary [of Transportation] by 49 U.S.C. Subtitle V, Part A (Safety, chapter 201 et seq.)").

failing to comply with regulations issued by the FRA (a specific regulatory duty). *Lilly*, 317 U.S. at 485–86; *King*, 855 F.2d at 1489 & n.2; *McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 299 (7th Cir. 1996).

## B. Factual Background

The relevant facts, as set out in Straub's First Amended Complaint, are as follows. *See Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (holding that in the context of reviewing the grant of a Fed. R. Civ. P. 12(b)(6) motion to dismiss, this court will "accept all well-pled factual allegations as true and view these allegations in the light most favorable to the nonmoving party"). Straub was injured on September 9, 2012, while working in the course and scope of his employment with BNSF. On that day, Straub was assigned to work as an engineer on Locomotive #6295, a coal train originating out of Gillette, Wyoming. Just prior to departure, Straub attempted to adjust the seat assembly. The seat moved initially, and then stopped abruptly and unexpectedly, causing injury to his back and neck. Straub reported the condition of the seat to BNSF. "A Mechanical Department employee responded to the locomotive, attempted to move the seat, experienced the same problem, inspected the adjustment mechanism, and then oiled the adjustment mechanism."

The adjustment mechanism on the engineer's seat is intended to allow the engineer to move the seat forward or backward, thereby providing a safe and a comfortable position for the engineer to operate the locomotive. The defective

-6-

condition of the adjustment mechanism made it unsafe to operate and created a risk of injury because, among other things, the seat moved some distance then stopped unexpectedly while pressure was being applied to move the heavy engineer's seat in a bent-over position. The seat and its adjustment mechanisms are one unit, and an essential and integral part of the locomotive. Attached to the operative complaint are pictures of the engineer's chair. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference . . . ."). Those pictures include the operating instructions for the chair's various adjustment mechanisms, which instructions are attached to the back of the engineer's chair. The operating instructions include several diagrams that explain the various functions of the engineer's chair (e.g., "lumbar horizontal adjust handle," "seat back recline adjust handle," "track fore & aft adjust handle," and "footrest height adjust pedal"). A particularly relevant set of diagrams show that the "locomotive wall mounted channel," the mechanism that allows for the adjustment of the engineer's chair forward and backward in relation to the control panel, is also the mechanism

which attaches the engineer's chair to the locomotive. The relevant photographs are attached to this opinion as an appendix.[5]

---

[5]Because of the way this case proceeded through litigation, the record contains significant additional information about the engineer's chair. *See infra* Section II.C. (describing the procedural history of this case). Notably, the district court considered this information in denying, on the basis of futility, Straub's motion to file a Second Amended Complaint. *Id.*

The engineer's chair is secured and mounted to the locomotive by a wall-mounted seat adjustment mechanism (i.e., a metal channel). That is, the chair is mounted to a channel on the wall of the locomotive and suspended in the air; it does not come into contact with the locomotive's floor. The chair consists of the seat, the base of which attaches to a tripod pedestal assembly, and the footrest. The seat-footrest-tripod pedestal mechanism slides forward and backward in the channel of the seat adjustment mechanism. The seat adjustment mechanism, thus, performs several integrated functions: (1) it permits the seat to be moved forward and backward, allowing proper entry and exit; (2) it allows safe and comfortable access to the engineer's control panel for tall and short engineers; and (3) it securely fixes the seat in place during operation. BNSF admitted: (1) the adjustment mechanism is a "component on a locomotive"; (2) the adjustment mechanism is the "component that securely mounts and braces [the seat]" to the locomotive; and (3) if the seat were in proper condition, it would not have stuck when Straub attempted to operate it to move the seat backward. The BNSF mechanic who responded to Straub's report that the seat did not function properly stated the condition of the seat was such that if the maintenance he performed had not corrected the problem, the locomotive would have been taken out of service so the seat would not be used.

BNSF asserts it is inappropriate to consider this evidence in the context of reviewing a motion to dismiss. *Cf. generally Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (limiting consideration to the contents of the complaint when ruling on a Rule 12(b)(6) motion to dismiss). As noted above, however, the district court specifically considered all of this evidence in concluding any attempt by Straub to file an amended complaint would be futile (i.e., even a complaint containing this information would fail to state a valid claim). The district court's futility ruling is subject to de novo review. *Miller ex rel. S.M. v. Bd. of Educ.*, 565 F.3d 1232, 1249 (10th Cir. 2009) ("We ordinarily review a denial of a motion to amend a pleading for abuse of discretion. However, when

(continued...)

## C. Procedural Background

Straub filed this action alleging five "claims" for relief. His first "claim" for relief alleged negligence under FELA. The second "claim" alleged a violation of LIA. The third, fourth, and fifth "claims" for relief alleged violations of regulations promulgated by the FRA, 49 C.F.R. §§ 229.7 (reiterating the duties LIA imposes on railroad operators), 229.21 (imposing a duty of daily inspections on railroad operators), and 229.45 (mandating that "[a]ll systems and components on a locomotive shall be free of conditions that endanger the safety of the crew, locomotive or train).[6] BNSF moved to dismiss all four of Straub's claims that

---

[5](...continued)
denial is based on a determination that amendment would be futile, our review for abuse of discretion includes de novo review of the legal basis for the finding of futility." (citations omitted)). Given all this, BNSF's argument is not particularly convincing. This court need not resolve this issue, however, because the result in this appeal would be the same even if this court limited its consideration strictly to the four corners of Straub's First Amended Complaint.

[6]Straub's complaint sets out five discrete "claims," specifically including four LIA "claims." The parties litigated the validity of Straub's LIA "claims" in district court through the lens of BNSF's motion to dismiss. On appeal, the parties continue to refer to LIA "claims." As noted above, however, LIA does not create a private cause of action. *See supra* Section II.A. It is only FELA that provides such a cause of action. *Id.* That does not mean LIA and its regulations are irrelevant. Instead, a plaintiff bringing a FELA claim is excused from the ordinary obligation to show negligence (i.e., duty and breach) if he can establish a violation of LIA. *Id.* Thus, Straub's complaint, for all practical purposes, sets out a single FELA claim with five potential theories of recovery, one based on BNSF's alleged negligence in failing to properly maintain the engineer's chair and four alternate methods of obtaining strict liability based on BNSF's asserted violations of LIA and its implementing regulations. Straub appears to have recognized as much at one point in the district court proceedings. In initial

(continued...)

relied on LIA-based strict liability. In a footnote in its motion to dismiss, BNSF stated it was unnecessary to separately analyze Straub's strict liability claims based on LIA's regulations because those regulations did nothing more than restate the standard set out in LIA itself. *See* Appellant's App. at 18 ("The Third, Fourth, and Fifth Claims for Relief are not independent claims, but merely restatements of the same general LIA standard in his second claim. Accordingly, Plaintiff's Second, Third, Fourth, and Fifth Claims state one claim for relief, and will be referred to as such in this motion."). BNSF then argued "LIA applies only to those parts and appurtenances that are (1) prescribed by a specific FRA regulation, or (2) essential or integral parts of a completed locomotive." Focusing exclusively on the "seat adjustment mechanism," it argued the mechanism is not

---

[6](...continued)
consideration of BNSF's motion to dismiss, a magistrate judge noted as follows:

> The Court notes . . . [Straub's] Claims 2-5 appear to seek recovery of damages resulting from violations of the LIA and certain regulations governed by the LIA. But, the LIA does not provide a private right of action to employees injured by defective equipment; rather, an injured employee must bring an action against his employer under [FELA]. [Straub] concedes as much in his brief responding to the present motion. Thus, while [Straub] may not seek damages under the LIA, he may cite a violation of the LIA to establish negligence per se against railroad carriers. Accordingly, the Court will construe Claims 2-5 as negligence per se theories by which [Straub] seeks to recover under the FELA (*see* Claim 1).

Appellant's App. at 113–14 (citations and footnote omitted).

integral or essential, nor required by regulation, and Straub could not, therefore, state a valid claim for strict liability.

The district court granted BNSF's motion to dismiss. Focusing exclusively on the seat adjustment mechanism, the district court concluded it was merely for comfort and not, therefore "an integral or essential part of a completed locomotive." In reaching that conclusion, the district court relied on this court's decision in *King*, 855 F.2d at 1488–89. The district court further concluded that because no regulation required that locomotives be fitted with seat adjustment mechanisms, Straub could not state a valid claim for relief under LIA. Notably, the district court did not address in any manner Straub's contention that 49 C.F.R. § 229.7 imposed upon BNSF a duty to maintain "the entire locomotive and its appurtenances," even assuming no regulation imposed upon BNSF a duty to install the seat adjustment device in the locomotive in the first instance. Thus, it appears the district court, sub silentio, agreed with BNSF's argument that the identified regulations did not impose upon BNSF any duty beyond the general duty set out in the language of LIA itself.[7]

Thereafter, the parties conducted discovery regarding Straub's negligence-based FELA claim. During that discovery, Straub developed significant evidence

_____

[7]In a later order directed to BNSF's motion for summary judgment on Straub's negligence-based FELA claim, the district court concluded 49 C.F.R. § 229.45 was inapplicable to Straub's claims because the regulation "specifically enumerate[s] the specific conditions that are covered, which does not include the seat adjustment mechanism."

supporting the assertion in his First Amended Complaint that the engineer's chair and the seat adjustment mechanism were part of one, single integrated unit. *See supra* n.5. Accordingly, Straub filed a motion to file an amended complaint to include additional allegations related to that evidence. The district court denied Straub's motion on the ground that proposed amendments were futile. This was so, according to the district court, because "the relevant seat adjustment mechanism is a legally inessential element of a completed locomotive."

## III. ANALYSIS

### A. Standard of Review

The legal sufficiency of a complaint is a question of law and a Rule 12(b)(6) dismissal is reviewed de novo. *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006). As noted above, for purposes of resolving a Rule 12(b)(6) motion, this court accepts as true all well-pleaded factual allegations in a complaint and views those allegations in the light most favorable to the plaintiff. *Id.* To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ." *Id.* at 556. As noted above, in evaluating the propriety of a district court's grant of a Rule 12(b)(6) motion to dismiss, we may consider not

only the complaint itself, but also attached exhibits. *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 964–65 (10th Cir. 1994).

## B. Merits

Straub argues the district court made a series of interrelated errors in granting BNSF's motion to dismiss. First, according to Straub, the district court erred when it applied LIA's "parts and appurtenances" language to a part or function of the engineer's chair—the seat adjustment mechanism—rather than to the engineer's chair itself. Second, Straub argues, the district court erred in relying on case law analyzing "failure to install" claims, when the instant case alleges a "failure to maintain." Finally, Straub asserts the district court erred when if failed to separately consider whether, even assuming the defect set out in his complaint did not fall within the general duties set out in LIA, the complaint stated a claim under the duties set out in 49 C.F.R. §§ 229.7 and 229.45 of the regulations. For the reasons set out below, this court agrees with Straub's contentions under 49 U.S.C. § 20701 and 49 C.F.R. § 229.7 and concludes the district court erred when it granted BNSF's Rule 12(b)(6) motion to dismiss.[8]

---

[8]Because Mr. Straub is able to advance his FELA claim past the motion to dismiss stage by alleging that the seat adjustment mechanism was an improperly maintained part and appurtenance of the locomotive for purposes of 49 U.S.C. § 20701 and 49 C.F.R. § 229.7, we need not determine whether the seat adjustment device is also a "component" of a locomotive for purposes of 49 C.F.R. § 229.45. But we are skeptical that the seat adjustment mechanism is a "component" of the locomotive. For sure, the list of items identified as

(continued...)

-13-

In concluding the facts alleged in Straub's complaint failed to state a violation of the general statutory duty to maintain a safe locomotive, the district court focused exclusively on the question whether the seat adjustment mechanism, as either a feature or fixture of the engineer's chair, was an essential or integral

[8](...continued)
"components" that shall be kept free "of conditions that endanger the safety of the crew" is a non-exhaustive list. *See Diede v. Burlington N. R.R. Co.*, 772 F.2d 593, 594 (9th Cir. 1985) (concluding list of "components" in 49 C.F.R. § 229.45 is "merely illustrative" and "not exclusive"). However, applying the *noscitur a sociis* and *ejusdem generis* canons of statutory construction, we must consider the items actually identified as "components" by the regulation when determining if an unidentified item is also a component. *Cf. Yates v. United States*, 135 S. Ct. 1074, 1085–86 (2015) (observing that (1) "we rely on the principles of *noscitur a sociis*–a word is known by the company it keeps–to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words'" (quoting *Gustafson v. Alloyd Co, Inc.*. 513 U.S. 561, 576 (1995)) and (2) "[a] canon related to *noscitur a sociis, ejusdem generis*, counsels: 'Where general words follow specific words in a statutory enumeration, the general words are usually constructed to embrace only objects similar in nature to those objects enumerated by the preceding specific words'" (quoting *Wash. State Dept. of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003))). All of the items identified in § 229.45 as "components" can be found in the engine compartment, electrical system, or gearing and wheel system of the locomotive rather than in the cabin of the locomotive such that the seat adjustment mechanism at issue in this matter does not resemble the items identified as "components" in the regulation. Furthermore, were we to construe "components" so broadly as to include the seat adjustment mechanism, it is difficult to imagine what item on a locomotive would qualify as an "appurtenance" but not a "component." Yet, we must strive to interpret the regulations as a whole in a manner so as to avoid a construction that renders a portion of the regulations superfluous. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme").

-14-

part of a complete locomotive.[9] *See, e.g.*, District Court Order at 4 (noting BNSF's argument was that "seat adjustment mechanisms are neither an integral nor essential part of a completed locomotive"); *id.* (agreeing with BNSF's arguments); *id.* at 5 ("Therefore, in order for seat fixtures to be covered by the LIA, the fixtures themselves must be an integral or essential part of a completed locomotive."). The district court answered that abstract question in the negative. As noted above, however, Straub's complaint asserts that it was the engineer's chair that was the part or appurtenance of Locomotive #6295 not "in proper condition and safe to operate without unnecessary danger of personal injury." *See* 49 U.S.C. § 20701(1). In particular, the complaint alleges "[t]he seat and its adjustment mechanisms are one unit." Pictures of the operating instructions for the engineer's chair's various adjustment mechanisms, which instructions are attached to the back of the engineer's chair, demonstrate the plausibility, if not veracity, of this allegation.[10] The pictures contain diagrams which show that the

---

[9]To be clear, in analyzing LIA, the Supreme Court has explicitly held Congress did not intend "that every gadget placed upon a locomotive by a carrier, for experimental purposes, should become part thereof within the rule of absolute liability." *S. Ry. Co. v. Lunsford*, 297 U.S. 398, 402 (1936). Instead, "[w]hatever in fact is an integral or essential part of a completed locomotive, and all parts or attachments definitely prescribed by lawful order of the [FRA], are within the statute." *Id.* For that reason, a particular piece of equipment attached to a locomotive qualifies as a part or appurtenance under LIA only if it is "an integral or essential part of a completed locomotive." *Id.*

[10]The record evidence adduced in this case while Straub's negligence-based
(continued...)

"locomotive wall mounted channel," the mechanism that allows for the adjustment of the engineer's chair forward and backward in relation to the control panel, is also the mechanism which attaches the engineer's chair to the locomotive. Thus, it is also the mechanism that allows the chair to comply with the regulatory requirement that the chair be "securely mounted and braced" to the locomotive. 49 C.F.R. § 229.119(a).

The district court did not cite in its order, and BNSF does not identify on appeal, any authority for the proposition that it is appropriate to disregard the integrated nature of the engineer's chair and, instead, focus on its component parts in analyzing whether a complaint states a viable violation of LIA. On the other hand, there exist numerous cases focusing their LIA statutory analysis on the engineer's chair, not on its component parts. *See, e.g.*, *Oglesby v. S. Pac. Transp. Co.*, 6 F.3d 603, 604–05 (9th Cir. 1993) (focusing analysis on engineer's chair, rather than the aspects of the chair (bent arms, tilted nature, and improperly supported backrest) that allegedly violated the statute); *Heiselmoyer v. Penn. R.R. Co.*, 243 F.2d 773, 774–76 (3d Cir. 1957) (focusing analysis on engineer's chair, rather than the chair's "back-rest"); *Munns v. CSX Transp., Inc.*, 579 F. Supp. 2d 924, 934 (N.D. Ohio 2008) ("Though failure to maintain seat padding is not a

[10](...continued)
FELA claim was litigated fully supports the contention that the seat adjustment mechanism is not an independent item of locomotive equipment but is, instead, an essential and integral part of the engineer's chair. *See supra* n.4.

-16-

claim in and of itself under the LIA, an inquiry into whether a seat was kept in good order and repair may include consideration of the seat's general condition, including whether it was properly padded."). Furthermore, the approach adopted by the district court is at odds with the remedial purposes of LIA. *Urie*, 337 U.S. at 189, 191; *Garcia*, 818 F.2d at 715. Such a reductive mode of analysis would serve only to minimize the applicability of LIA by reducing every piece of equipment on a locomotive down to its most basic component parts and, thereby, making it less likely such components are essential or integral to a completed locomotive.

Nor is the district court's analytical approach supported by this court's decision in *King*. In *King*, a railroad brakeman was injured when a locomotive collided with a cattle truck. 855 F.2d at 1487. He asserted a LIA violation on the basis that the brakeman's seat lacked armrests and seatbelts. *Id.* In response to the brakeman's suit, the railroad argued that the only requirement concerning locomotive seats was that they "be securely mounted and braced." *Id.* at 1487. The district court agreed and dismissed the brakeman's strict liability claims on the basis that such safety devices were not required by regulation. *Id.*

On the brakeman's appeal, this court began by recognizing that "a carrier cannot be held liable under [LIA] for failure to install equipment on a locomotive unless the omitted equipment (1) is required by federal regulations . . ., or (2) constitutes an integral or essential part of a completed locomotive." *Id.* at

1488–89 (footnote omitted). *King* further noted that the brakeman did not assert a violation of any of LIA's implementing regulations but, instead, argued "the chair was 'unsafe' because it lacked armrests." *Id.* at 1489. Thus, *King* held that the relevant question on appeal was "whether a locomotive chair can be 'unsafe' under [LIA] if it conforms to pertinent regulations, but lacks additional safety features." *Id.* In answering this question, *King* specifically emphasized "that a locomotive or its parts and appurtenances might satisfy federal regulations and still be 'unsafe' under [LIA]." *Id.* Then, in language particularly relevant to the resolution of this appeal, *King* noted that such a situation

> occurs when the railroad fails to maintain the locomotive or its parts and appurtenances so that the locomotive cannot be operated without unnecessary peril to life or limb.[11] Such "failure to maintain" claims have been widely recognized as meritorious. However, those claims are entirely different from claims that a railroad is liable for failing to install additional safety devices which the [FRA] has not seen fit to require. Such "failure to install" claims have been rejected.

*Id.* (footnote and citations omitted). Finally, *King* again emphasized that its holding was limited to failure to install claims and did not excuse railroad carriers from maintaining items installed on a locomotive. *Id.* at 1490 (citing to the Eight Circuit's decision in *Herold* and noting that "cases that hold the railroad liable for

---

[11]Although the BIA prohibited use of a locomotive unless all its parts and appurtenances were safe to operate "without unnecessary peril to life or limb," *see Lunsford*, 297 U.S. at 400, LIA utilizes the following language: "unnecessary danger of personal injury." 49 U.S.C. § 20701(1).

failing to maintain or keep in place a device already placed on the locomotive are distinguishable").

While it was perfectly natural in a failure to install case to focus narrowly on the safety item that it is alleged the railroad improperly omitted from a locomotive, nothing in *King* supports the notion that courts should break down an engineer's chair into its component parts or subsidiary functions when it is alleged an already-installed engineer's chair on a locomotive was not "safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). Several courts have ruled that a railroad carrier's failure to maintain its engineer's chair in a safe condition constitutes a violation of LIA's general duty to maintain a locomotive, as well as its parts and appurtenances, in safe condition. *See Oglesby*, 6 F.3d at 610; *Clemons v. Burlington N. Santa Fe Ry.*, No. cv–15–01788, 2016 WL 10586284, at *10 (C.D. Cal. April 8, 2016); *Stevenson v. Union Pac. R.R. Co.*, No. 4:07–cv–00522, 2009 WL 129916, at *2 (E.D. Ark. Jan. 20, 2009); *Terrell v. Soo Line R.R. Co.*, No. 2:04–cv–095, 2005 WL 4882750, at *5 (S.D. Ind. Sept. 1, 2005); *Spade v. CSX Transp., Inc.,* No. 5:02–cv–129, 2004 WL 2980740, at *4 (W.D. Mich. Jan. 30, 2004); *Kleeberg v. Norfolk S. Ry. Co.*, No. 00–C–963, 2001 WL 914460, at *2 (N.D. Ill. Aug. 13, 2001). We agree with these decisions in that narrow regard and hold that the allegations set out in Straub's complaint (i.e., that the engineer's chair failed when moved initially and stopped abruptly as Straub was attempting to adjust it) state a violation of LIA.

-19-

Once BNSF installed an engineer's chair with a seat adjustment mechanism, 49 U.S.C. § 20701(1) mandated that BNSF maintain the chair so that the seat adjustment device be "in proper condition and safe to operate without unnecessary danger of personal injury" and 49 C.F.R. § 229.7 mandated that BNSF maintain the chair so that the seat adjustment mechanism was "in proper condition and safe to operate in service . . . without unnecessary peril to life or limb."[12]

## IV. CONCLUSION

For those reasons set out above, the order of the United States District Court for the District of Colorado granting BNSF's motion to dismiss Straub's FELA claim to the extent it depends on LIA-based strict liability is, hereby, **REVERSED**. The matter is **REMANDED** to the district court for further proceedings consistent with this opinion.

---

[12]In noting § 229.7 supports the conclusion that an engineer's chair is a part or appurtenance of a complete locomotive for purposes of LIA, we express no opinion as to whether the regulations would independently support sending a LIA-based strict liability claim to the jury. *See supra* n.6 (discussing nature of the "claims" in Straub's complaint). That is, it is unnecessary to decide whether the regulation could reasonably be read as imposing strict liability for the unsafe condition of all parts and appurtenances of an operating locomotive.

Case 1:15-cv-01890-CMA-MEH   Document 2-6   Filed 11/05/15   USDC Colorado

Page 4 of 4



NOTE: FOOT REST SWIVELS 180°
BUT IS RESTRICTED TO THE
UPWARD POSITION EXCEPT IN
THE FORWARD POSITION (SHOWN)

LOCOMOTIVE WALL
MOUNTED CHANNEL

SEAT SWIVEL
LOCK HANDLE
W/ 30° LOCKOUTS

FOOT REST W/ FLIP
FORWARD EXTENSION
& BUMPER PROTECTOR

**SEAT OPERATING ADJUSTMENT CONTROLS**

1. LUMBAR HORIZONTAL ADJUST HANDLE:
   TURN HANDLE TO THE REAR TO INCREASE LUMBAR.
   TURN HANDLE OPPOSITE TO DECREASE LUMBAR.
2. ARM ADJUST KNOB:
   TURN CLOCKWISE TO RAISE ARM ANGLE.
   TURN COUNTERCLOCKWISE TO LOWER ARM ANGLE.
3. SEAT BACK RECLINE ADJUST HANDLE:
   LIFT TO RELEASE LOCK MECHANISM, TILT TO DESIRED
   ANGLE, LOWER HANDLE TO LOCK ANGLE.
4. SLEEPER POSITION ADJUST HANDLE:
   LIFT TO UNLOCK, TILT SEAT TO DESIRED SLEEPER POSITION,
   LOWER HANDLE TO LOCK.
5. CUSHION ADJUST:
   PULL FRONT OF CUSHION UP AND MOVE TO DESIRED
   POSITION. PUSH DOWN TO LOCK POSITION.
6. TRACK FORE & AFT ADJUST HANDLE:
   TO UNLOCK PULL UP ON HANDLE, ADJUST SEAT,
   RELEASE HANDLE TO LOCK.
7. SWIVEL ROTATIONAL ADJUST HANDLE:
   ROTATE HANDLE COUNTERCLOCKWISE TO UNLOCK
   & SWIVEL SEAT. TO LOCK: ROTATE HANDLE CLOCKWISE.
8. PEDESTAL HEIGHT ADJUST HANDLE:
   TO RAISE- LIFT HEIGHT ADJUST HANDLE AND REMOVE WEIGHT, LET SEAT
   RISE TO DESIRED HEIGHT, RELEASE HEIGHT ADJUST HANDLE TO ENGAGE PIN.
   TO LOWER- LIFT HEIGHT ADJUST HANDLE AND SIT IN THE SEAT WITH
   WEIGHT CENTERED OVER PEDESTAL, LET SEAT LOWER TO DESIRED
   HEIGHT AND RELEASE HEIGHT ADJUST HANDLE TO ENGAGE PIN.
9. FOOTREST HEIGHT ADJUST PEDAL:
   DEPRESS PEDAL AND MOVE TO DESIRED POSITION, RELEASE.
10. WALL MOUNT LOCK HANDLES:
    PULL TO DISENGAGE LOCK, SLIDE TO DESIRED POSITION,
    RELEASE HANDLE TO ENGAGE.

35°

FLOOR